UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Kathleen Theresa Scavello, | ) | Civil Action No.  5:14-0390-TLW-KDW |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Carolyn W. Colvin, Acting | ) | OF MAGISTRATE JUDGE |
| Commissioner of Social Security, | ) | |
| Defendant. | ) | |

This appeal from a denial of social security benefits is before the court for a Report and

Recommendation ("Report") pursuant to Local Civil Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff

brought this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision

of the Commissioner of Social Security ("Commissioner") denying her claim for Disability

Insurance Benefits ("DIB") pursuant to the Social Security Act ("the Act"). For the reasons that

follow, the undersigned recommends that the Commissioner's decision be affirmed.

I.      Relevant Background

        A.      Procedural History

        On December 23, 2005,[1] Plaintiff protectively filed for DIB under Title II of the Act, 42

U.S.C. §§ 401-433, alleging she became disabled on November 1, 2001. Tr. 220. After being

denied initially and at the reconsideration level, Tr. 105-06, Plaintiff requested a hearing before

an Administrative Law Judge ("ALJ"), Tr. 136. ALJ Francis F. Talbot conducted a hearing on

March 26, 2009, taking testimony from Plaintiff and a lay witness. Tr. 84-104. Plaintiff was not

represented by counsel at that hearing. Tr. 87. ALJ Talbot denied Plaintiff's claim in a decision

dated May 20, 2009. Tr. 110-119. Plaintiff obtained counsel and requested review of the decision

---

[1] The application for DIB is dated May 16, 2006, Tr. 220; however, as noted on the Disability
Determination and Transmittal, Plaintiff's filing date is December 23, 2005, Tr. 105.

from the Appeals Council. Tr. 178. The Appeals Council granted her request and remanded the case to the ALJ to give further consideration to Plaintiff's residual functional capacity ("RFC") including further evaluation of treating source opinions and supplemental evidence from a vocational expert ("VE"). Tr. 124-26. ALJ Richard L. Vogel held the second hearing on July 29, 2011. Tr. 35. Plaintiff appeared with counsel and testified, along with VE Patrick Brown, and her treating physician, Dr. Norman Bettle. *Id.* ALJ Vogel issued an unfavorable decision on September 20, 2011. Tr. 15-29. Plaintiff requested review of the decision from the Appeals Council, which denied her request on December 18, 2013, Tr. 1-6, making the ALJ's September 20, 2011 decision the Commissioner's final decision for purposes of judicial review. Plaintiff brought this action seeking judicial review of the Commissioner's decision in a Complaint filed February 14, 2014. ECF No. 1.

B.    Plaintiff's Background

Born on October 24, 1957, Plaintiff was 44 years old on her alleged onset date of November 1, 2001. Tr. 250. She has a high school education. Tr. 39. Plaintiff's past relevant work ("PRW") has been principally that of an undercover detective in a department store. Tr. 255. In applying for DIB, Plaintiff listed the following as limiting her ability to work: "Seizure; lower back/hip prbl[.]" Tr. 254. Plaintiff indicated these conditions limited her ability to work because she is "unable to lift/carry things/stand and sit too long; memory prbl[.]" *Id.*

C.    Administrative Proceedings

1.    Plaintiff's Testimony

At the July 29, 2011 administrative hearing, Plaintiff testified that she was 53 years old, divorced, and lived with her partner. Tr. 37-38. Plaintiff's attorney confirmed that Plaintiff's

2

alleged onset date was November 1, 2001, but "depending on the testimony we may be inclined to amend that a couple of years." Tr. 38.

Upon examination by counsel Plaintiff testified that she finished high school in New York, but could not remember the year she graduated. Tr. 39-40. Plaintiff had no other formal training. Tr. 40. Plaintiff stated she worked for a long time as a store detective in New York, initially for Abraham and Strauss, and then when Macy's took over she worked for Macy's. *Id.* In responding to a question regarding "responsibilities and requirements" in that job, Plaintiff testified it would be "one of three[.]" Tr. 40. She could either sit in a room and observe people on cameras, walk the sales floor and observe people more closely, or she could sit in rooms in the ceiling, called coops, and look down on people. *Id.* Plaintiff stated that if she was walking the floor and someone was shoplifting she could call for assistance. *Id.* Her primary duty as a floor walker was to "apprehend the person," which she stated sometimes required physical strength and coordination. Tr. 41. When she was watching the cameras and found someone shoplifting she would radio the floor walker and tell them the location. *Id.* Plaintiff testified that monitoring the cameras required concentration "because if you lost sight of them then you can't proceed, you wouldn't know what they were doing." *Id.* Plaintiff stated she did not often work in the coops because she had difficulty "crawling up there." *Id.* Plaintiff testified in 2001 she "wasn't feeling all that well." Tr. 42. At that time she was responsible for opening the building and making sure the loading dock was open but she "felt uncomfortable. Things were changing; [she] just didn't feel comfortable doing them." *Id.* Plaintiff's counsel acknowledged that Plaintiff was shaking and she was claiming that she suffered seizures. Tr. 43. Plaintiff stated that her "partner said that [she] started shaking once [she] had the seizures but they also told [her she'd] tried many medications and this particular medication that [she's] on they said one of the causes could

3

be more trembling." *Id.* Plaintiff stated that in her opinion and in her doctor's opinion it was necessary for her to take the medication. *Id.*

Plaintiff stated that she had not tried to go back to work since she stopped working in 2001. Tr. 43. Plaintiff's counsel asked regarding income of $3,000 or $4,000 in a subsequent year, but Plaintiff was unable to recall that work. Tr. 43-44. Plaintiff stated she had seizures before January 2007, but in January 2007 she had a seizure while driving. Tr. 44. Plaintiff's counsel provided a copy of a "police report made of that daytime event caused by one of [her] seizures." Tr. 45. Plaintiff stated that she is on three medications to prevent seizures that have side effects in addition to shaking. Tr. 46. Plaintiff testified that the medications cause her to feel very confused, have memory loss, and feel drowsy. Tr. 46-47. Plaintiff stated she does not drive and she is unable to handle her finances because she gets confused. Tr. 47-48. Plaintiff testified she cannot use a computer or cell phone because, although she tried, she was unable to learn how to use it. Tr. 49.

Plaintiff's counsel informed the ALJ that some of Plaintiff's earlier seizures were documented on video by Plaintiff's partner. Counsel was not sure if the videos were presented to and viewed by the prior ALJ because at the time of Plaintiff's earlier hearing she was not represented by counsel. Tr. 49-51. The ALJ stated that the video "does clearly have some relevance" and would accept it once it was provided by Plaintiff. Tr. 51.

Plaintiff testified that she also had problems with her back stemming from an accident in late 1977 when she was hit by a car when she was eight months pregnant. Tr. 51. Plaintiff stated she can "no longer walk up and down the stairs very well." *Id.* Plaintiff stated she performs some routine household chores but not as intensely or as regularly as before because it is "difficult" for her. Tr. 52. Plaintiff stated her partner does not allow her to go near the stove because he is afraid

4

of her getting burned. *Id.* Plaintiff stated she does not know how to use the microwave. Tr. 53. Plaintiff testified that she is able to bathe and dress herself, she visits with one neighbor with whom she feels comfortable, and she sometimes takes short walks. *Id.* Plaintiff stated she is able to do arithmetic but does not manage her household finances because she sometimes forgets to list checks. Tr. 55. Plaintiff stated that she does crossword puzzles to help with her memory but "it's getting more difficult." *Id.*

In response to questions from the ALJ Plaintiff testified that she had treatment for her back from a chiropractor when she first moved to South Carolina. Tr. 56. She stated she last had a mild "zone out" seizure "[w]ithin the month." Tr. 57. Plaintiff stated that she probably has four of those type seizures every month. *Id.* She testified that the seizures last for several minutes and that she recovers after about 20 minutes. Tr. 57-58. Plaintiff testified that she is "very tired" after a seizure and has severe headaches, so she will lie down. Tr. 60. She stated that she is unaware of how long her nighttime seizures last. *Id.*

2.    Testimony of Medical Expert (Plaintiff's Treating Physician)

Dr. Norman Bettle testified that he is a physician "specialized in neurology, Board certified and subspecialized in clinical neurophysiology and epilepsy, Board certified in clinical neurophysiology also." Tr. 61. Dr. Bettle stated he has been treating Plaintiff since 2008 and sees her three or four times a year. *Id.* He noted that "right now we see her more often because she has been enrolled in a clinical trial of an investigational anti-epileptic medication. . . ." Tr. 61-62. Dr. Bettle stated that he received medical records from some of Plaintiff's previous neurologists that indicated Plaintiff's "epilepsy started in 2002 and since 2004 has also included daytime seizures and has been intractable." Tr. 63. Dr. Bettle stated that intractable meant that "the seizures have occurred despite medication treatment." Tr. 64. Dr. Bettle testified that while it is

standard medical practice of rely on past medical records "each new physician will always question previous diagnosis and reaffirm for himself or herself that the diagnosis is correct." *Id.* Dr. Bettle stated he did that and that Plaintiff's prior diagnosis was correct. *Id.* Dr. Bettle stated that in his opinion Plaintiff condition was manifest before July, August, or September of 2007. *Id.* Dr. Bettle testified that Plaintiff had medically imposed restrictions due to her seizure disorder. Tr. 65. He stated "she is not allowed to drive. She is not allowed to put herself in any position which can easily harm her like bathing in a bathtub unsupervised, climbing on trees, scaffolds, whatever it will be, going in a boat and so forth unsupervised or you know climbing on trees not at all." *Id.* Dr. Bettle stated that Plaintiff was "not truly restricted but advised" that someone should be with her as much as possible. *Id.* When asked whether Plaintiff, in her current condition, could perform her past work as a security guard Dr. Bettle responded that he could not think of any occupation Plaintiff could safely perform. Tr. 65-66. He stated this was because Plaintiff had "random seizures, which are unpredictable" and she also may do things that could possibly endanger others. Tr. 66. Dr. Bettle testified that Plaintiff has cognitive limitations that include problems with short term memory, signs of depression, and "problems in other areas of cognition, calculation, [and] language . . . ." Tr. 66-67. Dr. Bettle stated his opinion was based on objective and clinical findings including review of a video of events representing Plaintiff having a seizure or in the time immediately following a seizure and an EEG performed in his office that supports a diagnosis of epilepsy. Tr. 67. Dr. Bettle noted that an EEG "will always be abnormal during a seizure but on many occasions will be normal in between seizures." Tr. 68. He also stated that an EEG can have "a subjective interpretation," and because he is "specialty trained in epilepsy and reading EEG's," he questions previous diagnoses and performs another EEG to "determine what [he] think[s] is going on." *Id.*

6

Dr. Bettle stated that Plaintiff was impaired in taking initiative but did not know if it was "due to depression or due to social anxiety because of her seizures, because of her medication related tremor" or for other reasons. Tr. 68. Dr. Bettle testified that although Plaintiff's medications have prevented her from having grand mal seizures, "she continues to have partial seizures which are called complex partial seizures because they impair awareness and consciousness." Tr. 69. Dr. Bettle stated that he could "not think of either any employment or any employer who would be willing to give her a job to do anything." *Id.* He stated that if she were employed she has "random episodes" and would be unable to perform her duties for "minutes to even hours afterwards." *Id.* Dr. Bettle opined that due to her seizures Plaintiff would be absent from work "several days per week but these are random." Tr. 70. When asked how her seizures would affect communication in the event of a security issue such as shoplifting, Dr. Bettle stated that Plaintiff's "seizures not only strike at random," but Plaintiff has no warning signs and is unable to alert someone else. Tr. 71. Dr. Bettle stated there was no evidence Plaintiff's episodes were brought on by stress. *Id.* Dr. Bettle stated that he has not formally tested Plaintiff's intellectual functioning but noted that at her office visits Plaintiff has "problems with thought processing." Tr. 72.

When asked by the ALJ Dr. Bettle confirmed that, based on the video documenting Plaintiff's seizures, her seizures last for "several minutes with a recovery time [that] could lead up to hours afterwards." Tr. 74. Dr. Bettle was unable to say in Plaintiff's case if "epilepsy surgery will make her seizure free but there is a chance." Tr. 76. Dr. Bettle testified that Plaintiff, as a result of the disease, has had "cognitive decline from a previous state of mind[.]" *Id.*

### 3.     VE Testimony

VE Brown also testified at the hearing. VE Brown described Plaintiff's PRW for six months in 2003 working in hardware sales under DOT 279.357-050, semi-skilled, SVP of 4, and light. Tr. 77. He noted that her security work from 1980 through 2001 fell into two categories, one was as a "merchant patroller . . . where the claimant was actually out on the floor, posing as a shopper" and the second "was as a surveillance monitor." *Id.* The merchant patroller was identified as DOT 372.667-038, semi-skilled, SVP of 3, light; and the surveillance monitor was DOT 379.367-010, unskilled, SVP of 2, sedentary. Tr. 77-78.

The ALJ asked the VE the following hypothetical:

[P]lease assume a hypothetical worker the same age as the claimant, with the same work background and education, who retains a light exertional capacity which would of course by definition would include sedentary as well. The following limitations would apply equally to either level, no climbing or exposure to hazards of any kind, no operation of motor vehicles, a low stress setting where there is no more than occasional decision making or changes in the setting itself, no exposure to the general public, no more than occasional interaction with co-workers and supervisors, and for the record as you know, we'll describe interaction as the requirement to work in conjunction or cooperation with other individuals as opposed to mere physical proximity.

Tr. 78. The ALJ asked the VE if such an individual could perform Plaintiff's past work of surveillance monitor. Although a portion of the VE's response was inaudible, the VE's response was "would be" as performed in the general economy. *Id.* The ALJ asked the VE to provide two occupations at the light level. Tr. 79. The VE testified that "looking at light and unskilled work there would be work as parts packers, 3,500 in South Carolina, 212,000 in the U.S. There are some 32 DOT's that match with that, representative DOT would be 525.687-118. Quality control examiners, 3,900 in South Carolina, 420,000 U.S. and roughly 70 DOT's match with that,

representative DOT would be 739.687-102. Those jobs would be unskilled and light . . . SVP 2." *Id.*

Plaintiff's counsel asked the VE if his opinion would change if the hypothetical individual would miss one or more days per week of work. Tr. 80. The VE responded that it would. *Id.* Plaintiff's counsel asked the VE to assume "that based on history and documented records this hypothetical employee is likely to suffer 20 minutes at a time random episodes where she has absented herself cognitively from her work and may take some period of time thereafter to recover" and asked if his opinion would change. *Id.* The VE stated that it depended on the length of time needed to recover and based on the earlier discussions "a 20 minute seizure followed by an hour or so of recovery time, if that happened four or five times a week, it would cumulatively built up so much lost time regardless [inaudible] of the employer." *Id.* Plaintiff's counsel asked if the VE's opinion would change if the employee should not be left alone. Tr. 82. The VE responded affirmatively and confirmed in response to the ALJ that constant monitoring would be "problematic." *Id.*

## II.    Discussion

### A.    The ALJ's Findings

In his September 20, 2011 decision, the ALJ made the following findings of fact and conclusions of law:

> 1.    Claimant last met the insured status requirements of the Social Security Act through on September 30, 2007.
>
> 2.    Claimant did not engage in substantial gainful activity during the period from her alleged onset date of November 1, 2001 through her date last insured of September 30, 2007 (20 CFR 404.1571 *et seq.*).

9

3. Through the date last insured, claimant had the following severe impairments: seizure disorder, depression, and lumbar degenerative disc disease (20 CFR 404.1520(c)).

4. Through the date last insured, claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that, through the date last insured, claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) with some additional limitations. Specifically, claimant can lift and carry up to 20 pounds occasionally and 10 pounds frequently. She can stand, walk, and sit for 6 hours each in an 8-hour day. Claimant is restricted from climbing, exposure to hazards, and the operation of motor vehicles. She is limited to work in a low stress setting[2] She is further restricted from having exposure to the general public and she is limited to no more than occasional interaction[3] with co-workers and supervisors.

6. Through the date last insured, claimant was capable of performing past relevant work as a surveillance monitor. This work did not require the performance of work-related activities precluded by claimant's residual functional capacity (20 CFR 404.1565).

7. Claimant was not under a disability, as defined in the Social Security Act, at any time from November 1, 2001, the alleged onset date, through September 30, 2007, the date last insured (20 CFR. 404.1520(f)).

_____

[2] Work in a low-stress (sic) requires only occasional decision-making and changes in the work setting.

[3] Interaction with co-workers and supervisors relates to working in conjunction or cooperation with others as opposed to mere physical proximity.

Tr. 17-29.

B.     Legal Framework

1.     The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for

benefits, who are not of retirement age, who properly apply, and who are "under a disability,"

defined as:

> inability to engage in any substantial gainful activity by reason of any medically
> determinable physical or mental impairment which can be expected to result in
> death or which has lasted or can be expected to last for a continuous period of not
> less than 12 months[.]

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations

promulgated under the Act have reduced the statutory definition of disability to a series of five

sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing

considerations and noting "need for efficiency" in considering disability claims).  An examiner

must consider the following:  (1) whether the claimant is working; (2) whether the claimant has a

severe impairment; (3) whether that impairment meets or equals an impairment included in the

Listings;[2] (4) whether such impairment prevents claimant from performing PRW; and (5)

whether the impairment prevents the claimant from performing specific jobs that exist in

---

[2] The Commissioner's regulations include an extensive list of impairments ("the Listings" or
"Listed impairments") the Agency considers disabling without the need to assess whether there
are any jobs a claimant could do. The Agency considers the listed impairments, found at 20
C.F.R. Part 404, Subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R.
§ 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the
listed impairments for at least one year, he will be found disabled without further assessment. 20
C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish
that his impairments match several specific criteria or be "at least equal in severity and duration
to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see
Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his
impairment is disabling at Step 3).

significant numbers in the national economy. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis.  If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82–62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act.  42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981)*; see generally Bowen*, 482 U.S. at 146, n.5 (regarding burdens of proof).

2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner made after a hearing to which he was a party." 42 U.S.C. § 405(g).  The scope of that federal court review is narrowly tailored to determine whether the findings of the

Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*, *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002) (citing *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 428 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings, and that her conclusion is rational. *See Vitek*, 428 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.     Analysis

Plaintiff alleges the following errors: (1) The ALJ erred in requiring contemporaneous medical evidence of onset and in failing to properly consider the retrospective opinion of Dr. Bettle; (2) The Appeals Council erred in failing to remand the case to consider the retrospective opinion of Dr. Bettle; (3) Because the VE testified Plaintiff's security work was a composite job, the ALJ's finding that she could return to only part of her job duties cannot be sustained; and (4) The VE's testimony did not consider all limitations supported by the record and cannot,

13

therefore, support the ALJ's alternative finding of other available work that Plaintiff could have performed. Pl.'s Br. 1, ECF No. 30.

1.    Alleged Onset and Consideration of Treating Physician's Opinion

a.    Plaintiff's Alleged Onset Date

Plaintiff alleges the ALJ "repeatedly focused on the limited treatment history" prior to her date last insured of September 30, 2007. Pl.'s Br. 14. In doing so, Plaintiff asserts the ALJ "failed to comply with Social Security Ruling 83-20 and controlling caselaw in improperly requiring contemporaneous medical evidence of onset." Pl.'s Br. 15. Citing to *Bird v. Commissioner of Social Security Administration*, 699 F.3d 337 (4th Cir. 2012), Plaintiff argues the ALJ in her case made the same mistake as the ALJ in *Bird* "of denying the case based primarily on a lack of contemporaneous medical evidence . . . ."  Pl.'s Br. 16-17. The Commissioner argues that "SSR 83-20 addresses 'the impact of lay evidence on the decision of onset' and contrary to Plaintiff's argument "there is no issue in this case regarding the date of disability onset because the ALJ found that [Plaintiff] was not disabled." Def.'s Br. 21, ECF No. 33. The Commissioner contends Plaintiff's reliance on *Bird* is misplaced as *Bird* was decided after the ALJ issued his adverse decision and because *Bird* is factually distinguishable. *Id.* at 22. Plaintiff argues in her Reply that the Commissioner's argument fails because the "policy that contemporaneous medical evidence is not required to establish the onset of disability, and that retrospective opinion evidence is important, plainly transcends the matter of whether a particular ALJ found disability to have commenced during the relevant period." Pl.'s Reply 1-2, ECF No. 34. Plaintiff argues that "the Fourth Circuit's opinion in *Bird* demonstrates as much." *Id.* at 2.

The undersigned agrees with the Commissioner that Plaintiff's disability onset date is not at issue. Social Security Ruling 83-20 provides: "*In addition to determining that an individual is*

14

*disabled*, the decision maker must also establish the onset date of disability." 1983 WL 31249, at *1 (emphasis added). Here, the ALJ found that Plaintiff "was not under a disability, as defined in the Social Security Act, at any time from November 1, 2001, the alleged onset date, through September 30, 2007, the date last insured." Tr. 29. The *Bird* case does not support Plaintiff's argument. In *Bird*, after finding the ALJ erred in evaluating the evidence, the court remanded the case with instructions to the ALJ to review all the evidence to determine whether the claimant was disabled. *Bird*, 699 F.3d at 345. Then, *if* the ALJ determined Bird had a disability but the evidence as to onset was ambiguous such that a retrospective inference was necessary, the ALJ would be required to obtain the assistance of a medical advisor to determine the date of onset. *See id.* Here, because there has been no determination of disability, the retrospective inference as to onset date is not needed.

### b.     Retrospective Opinion of Dr. Bettle

Plaintiff argues the ALJ erred in giving "little weight" to the retrospective opinion of her treating neurologist Dr. Bettle. Pl.'s Br. 17. Plaintiff asserts that Dr. Bettle's testimony, confirming his opinion that Plaintiff's seizures were at the severity of Listing 11.03 prior to her date last insured, warrants remand for an award of benefits; the ALJ failed to consider the factors in 20 C.F.R. § 404.1527(c)(2) in weighing Dr. Bettle's opinion; and the ALJ improperly "took on the role of medical expert." *Id.* at 18-22. The Commissioner asserts that substantial evidence supports the ALJ's decision that Dr. Bettle's May 2009 opinion was entitled to limited weight and his April 2009 treatment note and March 2011 letter were entitled to little weight. Def.'s Br. 24. The Commissioner argues that in this case, unlike *Bird*, "the pre-date last insured evidence actually weighed against any inference of linkage" to Dr. Bettle's retrospective opinions. *Id.* at 25 (citing *Griefenstein v. Comm'r of Soc. Sec.*, 2014 WL 198720 (E.D. Va. Jan. 15, 2014)).

i.    Dr. Bettle's Opinions

In April[3] 2009, Dr. Bettle completed questionnaires regarding Plaintiff's ability to do work-related activities. The instructions on both questionnaires stated the assessment was "to determine this individual's ability to do work-related activities on a day-to-day basis in a regular work setting . . . BASED ON YOUR EXAMINATION – of how the individual's physical capabilities are affected by the impairment(s)." Tr. 494, 497 (emphasis in original).  In the Mental Questionnaire, Dr. Bettle made the following determinations: In Section I  – Making Occupational Adjustments, he found Plaintiff had "fair" ability to follow work rules, deal with the public, use judgment, and deal with work stresses; "good" ability to relate to co-workers and interact with supervisors; and "poor" ability to work independently and maintain attention/concentration. Dr. Bettle noted that "long-standing epilepsy with ongoing seizures despite treatment has caused a static encephalopathy."[4] Tr. 495. In Section II—Making Performance Adjustments, Dr. Bettle rated Plaintiff as "fair" in her ability to understand, remember and carry out complex job instructions; understand, remember and carry out detailed, but not complex, job instructions; and understand, remember and carry out simple job instructions. *Id.* He noted "poor concentration, bradyphrenia"[5] as support for this assessment. *Id.* In Section III – Making Personal Social Adjustment, Dr. Bettle noted Plaintiff had "good" ability to maintain personal appearance, behave in an emotionally stable manner, relate predictably in

---

[3] Dr. Bettle's handwritten numerical date for the month is unclear. *See* Tr. 496. The ALJ refers to the date as April, but at the administrative hearing Plaintiff's counsel referred to the date as June. Tr. 70. The specific month is not significant to the opinion.

[4] Static encephalopathy is defined as a disease of the brain that does not get better or worse. *See* http://medical-dictionary.thefreedictionary.com/Static+encephalopathy  (last  visited  May  27, 2015).

[5] Bradyphrenia is defined as slowness in mental processing due to a decreased ability to shift quickly from one conceptual pattern to another; most often seen with Parkinson disease. *See*

16

social settings, and demonstrate reliability. Tr. 496. In Section IV – Other Work-Related Activities, Dr. Bettle noted other work-related activities affected by Plaintiff's impairment as "unpredictable seizure occurrence can lead to amnesia spell anytime." *Id.* In the final section of the questionnaire Dr. Bettle checked "no" in response to the question regarding Plaintiff's capability to manage benefits. *Id.*

In the Physical Questionnaire Dr. Bettle checked "no" in response to the questions asking if lifting/carrying, standing/walking, or sitting were affected by the impairment. Tr. 498. As to postural activities, Dr. Bettle noted Plaintiff was "not advised [to climb] due to fall risk with seizure." Tr. 499. Dr. Bettle found no physical functions affected by the impairment. *Id.* As to environmental restrictions, Dr. Bettle noted a height restriction of three feet along with restrictions for moving machinery, temperature extremes and chemicals. He noted no other restrictions. Tr. 500.

In a separate questionnaire simply titled "Epilepsy" Dr. Bettle indicated Plaintiff exhibited psychomotor convulsive epilepsy and described the seizure pattern as "sudden onset of unresponsiveness, at times associated with generalized convulsions." Tr. 503. He indicated the condition occurred more frequently than once per month despite at least three months prescribed treatment. *Id.* Dr. Bettle also noted Plaintiff exhibited daytime episodes of loss of consciousness and convulsive disorders. He did not indicate nocturnal episodes manifesting residuals which interfere significantly with activity during the day.[6] *Id.* Dr. Bettle also indicated Plaintiff exhibited psychomotor non-convulsive epilepsy with a seizure pattern of "sudden onset of unresponsiveness." Tr. 504. He indicated this condition also occurred more frequently than once

---

http://medical-dictionary.thefreedictionary.com/bradyphrenia (last visited May 20, 2015).
[6] Dr. Bettle originally left this section of the form blank, but when returned to him for

per month despite at least three months prescribed treatment. *Id.* Dr. Bettle indicated "yes"[7] to the question that asked whether Plaintiff exhibited "alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day." *Id.*

> On May 21, 2009, Dr. Bettle provided a letter to Plaintiff's counsel stating:

> In response to your letter of April 23, 2009, I reviewed [Plaintiff's] medical records. Between my last time seeing her and today, I have received medical records from at least some of her previous neurologists including Dr. Braunstein from New York and Dr. Kohli from Hilton Head. These medical records indicate that epilepsy started in 2002 and since 2004 has also included daytime seizures and has only[8] been intractable, i.e., not responding completely to medication treatment. I would therefore estimate with reasonable medical certainty that the cognitive limitations causing an inability to work started around 2004.

Tr. 534.

> On March 23, 2011, Dr. Bettle provided a letter addressed "To Whom It May Concern" and stated:

> [Plaintiff has been a patient of mine since October 2008. She started having seizures in 2002 and continues to have fairly frequent partial complex seizures with associated impairment of consciousness despite antiepileptic combination treatment. Prognosis for complete control of her seizures is extremely poor, i.e., I do not believe that she will be controlled completely in the future. Therefore, she is not safe to drive or hold gainful employment. I strongly support [Plaintiff's] quest for permanent disability.

Tr. 544.

### ii.    ALJ's Consideration of Opinion Evidence

SSR 96-2p provides that if a treating source's medical opinion is "well-supported and 'not inconsistent' with the other substantial evidence in the case record, it must be given

---

completion, *see* Tr. 320, he indicated "no" to this question, Tr. 321.

[7] Dr. Bettle left this question blank on the original form, Tr. 504, but when returned to him for completion he wrote "yes" in response, Tr. 322.

controlling weight[.]"  *See also* 20 C.F.R. § 404.1527(c)(2) (providing treating source's opinion will be given controlling weight if well-supported by medically-acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the record); *see also Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (finding a physician's opinion should be accorded "significantly less weight" if it is not supported by the clinical evidence or if it is inconsistent with other substantial evidence).

The Social Security Administration typically accords greater weight to the opinion of a claimant's treating medical sources, because such sources are best able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *See* 20 C.F.R. § 404.1527(c)(2). However, "the rule does not require that the testimony be given controlling weight." *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam). Rather, "[c]ourts evaluate and weigh medical opinions pursuant to the following non-exclusive list:  (1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." *Johnson v. Barnhart*, 434 F.3d at 654; 20 C.F.R. § 404.1527. Treating source medical opinions are entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight. As explained in SSR 96-2p,

> a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must

---

[8] The word "only" has a line drawn through it.

> be weighed using all of the factors provided in 20 CFR 404.1527. . . . In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

SSR 96–2p. The Ruling also requires that an ALJ's decision "contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* In reviewing the ALJ's consideration of the opinions of Plaintiff's physician, the court is focused on whether the ALJ's opinion is supported by substantial evidence. The court is not to "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Craig*, 76 F.3d at 589.

Here, in making his findings at step four regarding Plaintiff's RFC, in addition to discussing Plaintiff's hearing testimony (from both hearings) and her medical treatment records, the ALJ considered Dr. Bettle's testimony and opinions. Tr. 21-27. The ALJ first noted that Dr. Bettle was Plaintiff's treating neurologist and Dr. Bettle testified that "he was board certified in neurology with a subspecialty in epilepsy" and had been treating Plaintiff since 2008. Tr. 21. The ALJ reported Dr. Bettle's testimony regarding Plaintiff's seizures, how they affected her, his advice to Plaintiff, and his opinion that he did not think Plaintiff could perform her former job duties or handle family finances. *Id.* Regarding the timing of Plaintiff's seizures, the ALJ recounted treatment records indicating Plaintiff told doctors in 2004 through 2007 that her seizures occurred at night. Tr. 22. The ALJ noted: "In May 2009, claimant told her current neurologist, Dr. Bettle, that she had experienced daytime seizures since 2004, but treatment records from the relevant time period document few, if any, reports of daytime seizures or seizures while the claimant was awake." Tr. 22. The ALJ concluded that "seizures occurring

20

during sleeping hours would not have a significant impact on claimant's ability to perform work-related activities." *Id.* Plaintiff takes issue with this statement, arguing that the ALJ is improperly taking on the role of medical expert. Pl.'s Br. 21. However, as the Commissioner points out, in his April 2009 opinion Dr. Bettle stated that Plaintiff "had no nocturnal episodes manifesting residuals that interfered significantly with her activity during the day." Def.'s Br. 28 (citing Tr. 321, 503). Accordingly, the undersigned finds no error with the ALJ's statement.

> The ALJ noted the following about Dr. Bettle's testimony:
>
> Although claimant's treating neurologist, Dr. Bettle, testified on her behalf at the hearing, Dr. Bettle's testimony does not support a finding of disability on or before September 30, 2007, claimant's date last insured. The majority of Dr. Bettle's testimony, as outlined above, focused on claimant's current difficulties and is, therefore, not relevant to this claim. Dr. Bettle testified that he did not even begin treating claimant until 2008. Furthermore, while Dr. Bettle testified that claimant had significant cognitive difficulties as a result of her seizures, he also admitted that he had not formally tested claimant's level of intellectual functioning. Therefore, while the undersigned has carefully considered Dr. Bettle's testimony, the undersigned does not accord it significant weight with respect to the time period at issue.

Tr. 24. As to Dr. Bettle's opinions expressed in the April 2009 questionnaires, the ALJ gave them "limited weight as they do not indicate that claimant experienced any of the reported limitations during the relevant time period. Furthermore, most of the limitations reported are not supported by medical records on or prior to September 30, 2007." Tr. 26. The ALJ also gave limited weight to Dr. Bettle's May 2009 letter opining that Plaintiff's cognitive limitations caused an inability to work starting around 2004 because Dr. Bettle testified that he did not begin treating Plaintiff until 2008 and that he did not formally test Plaintiff's level of intellectual functioning. The ALJ noted that record evidence from the relevant time period also failed to support Dr. Bettle's opinion. Tr. 26-27. As to Dr. Bettle's opinion expressed in an April 2009 treatment note that Plaintiff would be unable to work due to the unpredictability of her seizures,

the ALJ gave this opinion little weight because it spoke to Plaintiff's condition as of April 2009 and the evidence did not support a finding that Plaintiff was unable to work on or prior to September 30, 2007. Tr. 27. Dr. Bettle's March 2011 opinion offering a poor prognosis for Plaintiff's control of her seizures and indicating it was unsafe for Plaintiff to drive or hold gainful employment was given little weight by the ALJ because that opinion did not address Plaintiff's condition during the relevant time period. *Id.*

Plaintiff asserts that the ALJ's conclusions are in error arguing that, contrary to the ALJ's findings, Dr. Bettle specifically related his opinion to her condition prior to her date last insured, contemporaneous medical evidence is not required, and that Dr. Bettle did not begin treating her until 2008 or because he did not test her intellectual abilities is not a proper basis to reject his opinion. Pl.'s Br. 21. The Commissioner asserts that the ALJ considered all the evidence from the relevant time period including medical records that documented few, if any, daytime seizures or that the seizures interfered with Plaintiff's daily activities. Def.'s Br. 22-24 (citing to ALJ's decision noting evidence regarding Plaintiff's seizure occurrences, ADLs, and evaluation of cognitive functioning that contradicted Plaintiff's testimony and Dr. Bettle's opinion). Additionally, the undersigned notes that the questionnaires offering Dr. Bettle's opinions on Plaintiff's mental and physical abilities specifically asked for the opinion based on Dr. Bettle's examination of how Plaintiff's capabilities were affected—not based on medical records or examinations of other treating physicians. *See* Tr. 494, 497. Accordingly, Dr. Bettle's opinion could not relate to evidence prior to his treatment of Plaintiff in 2008 or to any cognitive limitations that he did not identify through his own examination or testing. *Craig*, 76 F.3d at 590 (providing that "significantly less" than controlling weight be accorded a physician's opinion if it

22

is "not supported by clinical evidence"). Here, substantial evidence supports the ALJ's conclusion that Dr. Bettle's opinions were not entitled to controlling or substantial weight.

### c.   Lay Witness Testimony

Plaintiff asserts that "to the extent the medical evidence is lacking, the ALJ committed reversible error in failing to accord any weight to the lay evidence of onset." Pl.'s Br. 23. Plaintiff refers to the testimony of her "long-time partner" given at her prior administrative hearing regarding the onset of her seizures. *Id.* Plaintiff cites to SSR 83-20 to support her assertion that the ALJ should explore other sources of documentation including family members, friends, and former employers. *See* SSR 83-20, 1983 WL 31249 at *3. The regulation provides that "[t]he impact of lay evidence on the decision of onset will be limited to the degree it is not contrary to the medical evidence of record." *Id.*

In his decision the ALJ noted the prior testimony of Plaintiff's partner, Tr. 20-21, and found that "although claimant, [lay witness], and Dr. Bettle all testified that claimant has frequent seizures, treatment records from the relevant time period do not document a frequency of seizures consistent with a finding of disability," Tr. 22.  Although Plaintiff asserts the ALJ erred by failing to weigh this testimony, SSR 83-20 requires only that "[i]f reasonable inferences about the progression of the impairment cannot be made on the basis of the evidence in the file" it may be necessary to "explore other sources of documentation" including lay testimony. SSR 83-20.  The regulation does not require the ALJ to discuss in his written decision the weight given these individuals.

### 2.    Appeals Council's Failure to Remand

Plaintiff asserts that "[d]espite new and material evidence documenting that the onset of [Plaintiff's] epilepsy was prior to her date last insured, the Appeals Council erred in failing to

remand the matter to the ALJ." Pl.'s Br. 25. Plaintiff contends that the Appeals Council's failure to "set forth any analysis of why Dr. Bettle's assessment should not be credited" was error and there was "no indication that the Appeals Council meaningfully considered the new evidence." *Id.* The Commissioner argues that Dr. Bettle's March 28, 2012 letter was not new or material within the meaning of sentence six of 42 U.S.C. § 405(g) and therefore remand is not warranted. Def.'s Br. 31-32. Plaintiff counters that she is seeking a sentence four remand and therefore does not need to show "good cause" for failing incorporate the evidence into the record in earlier proceedings, and reasserts that the evidence is new and material. Pl.'s Reply 6-7.

On March 28, 2012, after the ALJ's decision and in response to a letter from Plaintiff's attorney, Tr. 387-92, Dr. Bettle wrote a letter discussing the unfavorable decision, Tr. 548. Dr. Bettle stated that two of the physicians the ALJ referred to as neurologists were actually primary care physicians and therefore his (Dr. Bettle's) "expert opinion on the disability of [Plaintiff] due to epilepsy and associated cognitive impairment should be prioritized over the other physicians' statements." Tr. 548. In response to the ALJ's finding that another neurologist reported in 2006 that Plaintiff's seizures occurred exclusively at night, Dr. Bettle stated the following:

> I need to stress that patients self-reports usually underestimate the amount of seizure and it is in my opinion unquestionable that [Plaintiff] had self-unrecognized daytime seizures even during that time as supported by the video submitted to the Judge for review. This video which was not taken into consideration clearly showed that [Plaintiff] had daytime seizures prior to 2007 and was at no point considered in remission, i.e., completely controlled from seizures. In addition, as a result of the longstanding uncontrollable nature of her seizure disorder, she has developed cognitive impairment which, in my opinion, also dates back prior to September 2007. For all these reasons, she was not able to hold gainful employment prior to September 2007.

*Id.*

The Appeals Council considered Dr. Bettle's letter, but denied Plaintiff's request for review finding that "this information does not provide a basis for changing the Administrative Law Judge's decision." Tr. 2.

Applicable law indicates that when a claimant requests review of an ALJ decision, the Appeals Council "may deny or dismiss the request for review, or it may grant the request and either issue a decision or remand the case to an [ALJ]." 20 C.F.R. § 404.967. The regulations permit claimants to submit additional evidence that was not before the ALJ when requesting Appeals Council review. 20 C.F.R. §§ 404.968, 404.970(b). In such cases, the regulations require that the Appeals Council first determine if the submission constitutes "new and material" evidence that "relates to the period on or before the date of the [ALJ's] hearing decision." § 404.970(b). The sentence-four-remand standard is used to evaluate additional evidence that was submitted to the Appeals Council and made part of the record. *See Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *Wilkins v. Sec'y, Dep't Health and Human Servs.*, 953 F.2d 93, 96 n.3 (4th Cir. 1991). The *Wilkins* court noted the requirements of "new" and "material" applied to all evidence for which a claimant seeks remand under 42 U.S.C. § 405(g), but noted "good cause" is not required when seeking to present new evidence to the Appeals Council. *Wilkins*, 953 F.3d at 96 n.3. "Evidence is new 'if it is not duplicative or cumulative' and is material if there is 'a reasonable possibility that the new evidence would have changed the outcome.'" *Meyer*, 662 F.3d at 705 (quoting *Wilkins*, 953 F.2d at 95–96). If, upon consideration of all the evidence (including any new and material evidence), the Appeals Council finds that the ALJ's action, findings, or conclusions are not contrary to the weight of the evidence, it can simply deny the request for review. *Meyer*, 662 F.3d at 705. Nothing in the SSA or the regulations requires the Appeals Council to explain its rationale for denying review. *Id.*

25

In this case, because the Appeals Council denied review of the ALJ's decision, it was not required to provide any findings or explain its rationale in any way. *Meyer*, 662 F.3d at 705. For this reason alone, Plaintiff's arguments relating to the Appeals Council's review do not present reversible error.

### 3.     VE's Testimony Regarding Plaintiff's Prior Work

Plaintiff next asserts that because the VE's testimony established that Plaintiff's prior work as a store detective encompassed two different job titles in the DOT and was therefore a composite job, the ALJ erred in finding that Plaintiff could return to only part of her job duties. Pl.'s Br. 27. The Commissioner argues that because Plaintiff testified that "she did 'one of three' jobs when she worked as a store detective . . . her work as a surveillance monitor could be parsed out as a separate job." Def.'s Br. 28.

A plaintiff is "not disabled" within the meaning of the Act if she can return to the specific job as she actually performed it or the same kind of work as it is customarily performed in the economy. SSR 82–62, 1982 WL 31386, at *3. Social Security Ruling 82–62 states what an ALJ is required to consider in finding that a claimant can return to her PRW:

> Determination of the claimant's ability to do [past relevant work] requires a careful appraisal of (1) the individual's statements as to which past work requirements can no longer be met and the reason(s) for his or her inability to meet those requirements; (2) medical evidence establishing how the impairment limits ability to meet the physical and mental requirements of the work; and (3) in some cases, supplementary or corroborative information from other sources such as employers, the *Dictionary of Occupational Titles*, etc., on the requirements of the work as generally performed in the economy.

*Id.*

If the main duties of PRW can be described only by considering multiple DOT occupations, a plaintiff may have performed a composite job. *See Plumb v. Astrue*, C/A No.

26

8:10-3090-RBH, 2012 WL 768058, at *6 (D.S.C. Mar. 7, 2012) (remanding with the instruction that the ALJ must determine whether the past relevant work was a composite job); see also the Administration's Program Operations Manual System ("POMS") at Dl 25005.020(B) ("Determining if work was a composite job"). According to this POMS section, when comparing a claimant's RFC to a composite job as it was performed, the ALJ must find the claimant "capable of performing the composite job only if he or she can perform all parts of the job." *Id.* This POMS section also informs the ALJ that "[a] composite job will not have a DOT counterpart, so do not evaluate it at the part of step 4 considering work 'as generally performed in the national economy.'" *Id.* At Step 5, however, it may be found that a claimant may be able to use skills gained from a composite job to adjust to other work. *Id.*

Here, the ALJ failed to properly explain his reasoning for finding the job of "surveillance monitor" to be PRW for Plaintiff as opposed to finding it to be part of a composite job. If Plaintiff's past job was a composite job, the POMS would have prohibited the ALJ from deciding whether Plaintiff could perform her PRW as it is generally performed. The VE explained that Plaintiff's past security work fell into two broad categories with different DOT numbers. Tr. 77-78. The duties of the "merchant patroller" position required Plaintiff to be on the store floor posing as a shopper and watching customers. Tr. 77. According to the POMS, when comparing the Plaintiff's RFC to a composite job as it was performed, the ALJ must find the Plaintiff capable of performing the composite job only if he or she can perform all parts of the job. The ALJ's decision contains no such discussion. In his RFC determination the ALJ restricted Plaintiff from exposure to the general public. Tr. 20. This would be contrary to the duties of merchant patroller. In finding that Plaintiff could perform her PRW of surveillance monitor the ALJ appears to have based his RFC determination on the least demanding aspect of

27

Plaintiff's composite job. Such a finding is contrary to the regulations. However, this did not end the ALJ's analysis. He provided alternative findings for step five, noting other jobs existing in the national economy that Plaintiff could perform. Tr. 27-28. Thus, the ALJ's failure to evaluate and discuss Plaintiff's PRW as a composite job is harmless error.

4.      VE's Testimony Regarding Plaintiff's Limitations

Finally, Plaintiff asserts that in making the alternative finding that Plaintiff could perform other light work, the ALJ relied on the VE's response to a hypothetical question that did not fully reflect Plaintiff's actual limitations. Pl.'s Br. 32-33. Plaintiff contends the record evidence supports that due to her intractable seizures Plaintiff should not be left alone and based on the frequency of her seizures she would miss one or more days of work per week. *Id.* at 34. The Commissioner argues that the ALJ was not required to include in his hypothetical additional limitations based on Dr. Bettle's retrospective opinion that "were not supported by the record during the relevant period." Def.'s Br. 29.

The undersigned finds that the record did not compel the ALJ to include additional limitations in the hypothetical to the VE. Although Dr. Bettle testified Plaintiff had intractable seizures since 2004 the ALJ did not find Dr. Bettle's opinions fully supported by the medical records and gave them limited weight. The ALJ noted that despite the testimony, treatment records from the relevant time period did not "document a frequency of seizures consistent with a finding of disability," Tr. 22, and did not "document any significant reduction in her ability to engage in activities of daily living on or before September 30, 2007," Tr. 23. As to Dr. Bettle's testimony that someone should be with Plaintiff as much as possible, Dr. Bettle noted this was "not truly restricted but advised." Tr. 65.

The record did not compel the ALJ to include additional limitations in his hypothetical questions to the VE. Although in response to further questioning from Plaintiff's attorney—who included additional limitations not found by the ALJ in a hypothetical—the VE testified that Plaintiff would not be able to work with those limitations, *see* Tr. 80-82, those were not the limitations found by the ALJ in his decision. While Plaintiff may disagree with the findings of the ALJ, the undersigned has concluded that these findings are supported by substantial evidence in the record as that term is defined in the applicable case law. Therefore, the hypothetical given by the ALJ to the VE was proper, and there are no grounds for reversal of the decision based on the ALJ's treatment of the VE's testimony.  An ALJ is not required to accept the answers a VE gives to a hypothetical that contains limitations not ultimately adopted by the ALJ. *See Hammond v. Apfel*, 5 F. App'x 101, 105 (4th Cir. 2001).

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the undersigned recommends that the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.


May 28, 2015                                          Kaymani D. West
Florence, South Carolina                             United States Magistrate Judge

**The parties are directed to note the important information in the attached**
**"Notice of Right to File Objections to Report and Recommendation."**